IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| SANDRA MUNSTER, individually and on behalf of all others similarly situated, | Civil Action No.: |
| Plaintiff, | Class Action Complaint |
| v. | Jury Trial Demanded |
| RESTAURANT BRANDS INTERNATIONAL, INC., BURGER KING WORLDWIDE, INC., and BURGER KING CORPORATION, | |
| Defendants. | |

## INTRODUCTION

1.      The average fast food worker in the United States earns $8.29 an hour.[1] In contrast, the United States' "living wage"—the "approximate income needed to meet a family's basic needs"—is $15.12.[2]

2.      Contributing to this wage gap, according to a study by two Princeton economists, are no-poach provisions in franchise agreements of most major fast food chains which prohibit one restaurant owner from offering work

---

[1] http://bit.ly/2R4PvuT.
[2] Massachusetts Institute of Technology (MIT), http://bit.ly/2OPOQvY.

-1-

to employees of another restaurant owner.[3] Beginning no later than 2010, Burger King—which has more than 7,000 restaurants across the country—imposed such a no-poach clause in their standard franchise agreement. Owners of a Burger King franchise, for example, cannot hire anyone who works or worked at another Burger King within the previous six months. One of the Princeton study's authors explains that these no-poach provisions can "significantly influence pay" by obviating the need for franchise owners to compete for the best workers.[4]

3.    Another study, co-authored by Eric Posner, a professor at the University of Chicago Law School, found that "[w]hen a franchisor requires the different franchisees within its chain not to poach each other's workers … the no-poaching agreement is anticompetitive, and will tend to suppress the wages of workers."[5]

4.    Many states, such as California and Oklahoma, prohibit non-compete clauses in employment agreements. But by facilitating agreements between *franchise owners* not to compete for each other's workers, major brands like Burger King have been able to effectively utilize and enforce from these prohibited clauses.

5.    Federal courts recognize that these no-poach clauses in franchise

---

[3] https://nyti.ms/2IkOon9.
[4] *Id*.
[5] http://bit.ly/2DBGJSE.

agreements are anticompetitive agreements between and among franchisors and franchisees to reduce worker wages. For instance, in June 2018 a federal court upheld a federal antitrust claim against McDonald's for its no-poach clause, opining that "[e]ven a person with a rudimentary understanding of economics would understand" that if McDonald's franchises do not compete with each other for workers, wages "would stagnate."[6] Another federal court ruled similarly in an antitrust action pertaining to Jimmy John's no-poach agreements.[7]

6.      Many states' attorneys general are investigating fast-food chains (and other industries) for their no-poach practices, and, as of October 15, 2018, at least 30 national chains, including Burger King, have already entered consent decrees with the Washington Attorney General, pledging to remove no-poach provisions from their franchise agreements.[8]

7.      While eliminating these anticompetitive clauses will help fast food workers going forward, current and former employees of Burger King restaurants—including Plaintiff Sandra Munster—are owed antitrust damages for years of wage suppression. This action seeks to recover these damages and obtain additional injunctive relief on behalf of Ms. Munster and similarly

---

[6] *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2018 WL 3105955, at *5 (N.D.Ill. June 25, 2018) (citation omitted).
[7] *Butler v. Jimmy John's Franchise, LLC*, No. 18-cv-0133-MJR-RJD, 2018 WL 3631577 (S.D.Ill. July 31, 2018).
[8] https://bit.ly/2SegSmW.

situated Burger King workers.

8.      Burger King's no-poach provision violates Section 1 of the Sherman Act, 15 U.S.C. §1. By facilitating and entering agreements not to compete among its franchises (and itself) Burger King harmed Plaintiff and the class by suppressing their wages.

## JURISDICTION AND VENUE

9.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.

10.     Under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Section 4 of the Sherman Act, 15 U.S.C. §4, as well as 28 U.S.C. §§1331, 1332(d), and 1337, the Court has subject matter jurisdiction to prevent and restrain the Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. §1.

11.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and under 28 U.S.C. §1391(b)(2) and (c)(2). Burger King has its principal place of business in this district and transacts or has transacted business in this district. Many of the events that gave rise to this action occurred in this district.

12.     Burger King is in the business of selling hamburgers and other

food products to consumers, both through the restaurants it owns and through independently owned and operated franchise restaurants. In the United States these restaurants may be found in all 50 states and the District of Columbia. Burger King has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise. Burger King engages in substantial activities at issue in this Complaint that flow through and substantially affect interstate commerce.

## PLANTIFF

13.     Plaintiff Sandra Munster is a resident of Ottawa, Illinois. She was employed by Cave Enterprises, Inc., a Burger King franchisee that owns and operates more than 100 Burger King stores located in Wisconsin, Michigan, Illinois, Indiana, Minnesota and South Dakota. Munster was employed for about 15 years at the restaurant located at 209 East Norris Drive, Ottawa, Illinois, 61350, starting as a supervisor and eventually rising to the position of general manager.

## DEFENDANTS

14.     Defendant Restaurant Brands International, Inc. ("RBI") is an Ontario corporation based in Oakville, Ontario, Canada. RBI owns the Burger King brand through its subsidiaries Burger King Worldwide, Inc. ("BKW") and Burger King Corporation ("BKC"), (collectively, "Defendants" or "Burger King").

15.     BKW, a wholly-owned subsidiary of RBI, is a Delaware

corporation headquartered in Miami, Florida.

16. BKC, a wholly-owned subsidiary of BKW, is a Florida corporation headquartered in Miami, Florida.

17. Burger King is in the business of selling food to customers both through its own restaurants and through independently owned and operated franchise restaurants.

## AGENTS AND CO-CONSPIRATORS

18. The acts alleged against Defendants in this action were authorized, ordered, or conducted by Defendants' officers, agents, employees, or representatives actively engaged in the management and operation of Defendants' businesses and affairs.

19. Various other corporations and persons that are not named defendants in this action, including Burger King franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

20. Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## FACTUAL ALLEGATIONS

### The Franchise Model

21. Like most fast food chains, Burger King operates under a franchise model which involves the owner of a business (the franchisor)

licensing, in return for a fee, to third parties (the franchisees) the right to operate a business or distribute goods and/or services using the franchisor's business name and systems (which varies depending on the franchisor) for an agreed period of time. The franchisor also often owns and operates locations.

22.     The franchise fee may be an upfront payment by the franchisee to the franchisor, an ongoing fee (*e.g.*, an agreed percentage of revenue or profit) or a combination of the two. Franchising is an alternative to the franchisor building, owning and operating all of the stores or restaurants in the chain.

### The Burger King System

23.     Founded in 1953 as "Insta-Burger King," a Jacksonville, Florida based restaurant chain, Burger King operates its restaurant business on a franchise model. It is the second-largest fast food hamburger chain in the world, the fourth-largest fast food chain in America by sales and sixth-largest by number of restaurants. Burger King restaurants' primary menu items are hamburgers (including its signature product, the Whopper), chicken, salads, side items, drinks and desserts.

24.     In the "Careers" section of its website, Burger King tells prospective employees that, "if you're looking for the chance to really make something of yourself, that's exactly what you'll find at BKC." Burger King assures prospective employees that ". . . you'll never be short of opportunities

to show what you've got[]" and  that "there's no limit to how far you could go here."[9] But, in reality, there is a limit:  the four walls of the particular restaurant where a Burger King worker is employed.

25.    As of 2017, Burger King had approximately 7,226 restaurant locations in the United States. Less than 1% of those locations—about 50—were company-operated; the remaining restaurants were owned and operated by franchises.

26.    Burger King generates revenue from numerous sources, including rent charged to franchisees for properties Defendants own, royalties based on a percentage of sales by franchisees at their restaurants, fees paid by franchisees, and revenue from operating restaurants that Burger King owns. Burger King's franchises drive its profitability, with franchise and property revenues accounting for more than 90% of its total revenues in 2015, 2016 and 2017.

*The No-Poach Clause*

27.    To own a Burger King franchise, an aspiring franchisee must sign a standard franchise agreement with BKC, with a typical term of 20 years. In addition, a franchisee must pay a franchise fee of approximately $50,000, training and other fees, and a percentage of monthly gross sales as a royalty to

---

[9] https://www.bk.com/careers/bring-it-bkc

Burger King. Franchisees and managers of Burger King restaurants are required to attend training programs at Burger King training centers, with the cost borne by the franchisees. The total investment necessary to begin operating a Burger King franchise restaurant is between approximately $323,000 and $3 million dollars; the variation is primarily driven by real estate and construction costs.

28.    Beginning no later than 2010 and continuing through at least September 13, 2018, Burger King incorporated a clause into its standard franchise agreement prohibiting Burger King and its franchisees from soliciting or hiring existing employees of Burger King restaurants (the "No-Poach Clause"). Specifically, BKC and franchisees agreed to the following:

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

29.    Burger King franchisees also agreed that BKC had the unilateral power to terminate their franchises upon a franchisee's default, which includes franchisees' failing to comply with the No-Poach Clause. Burger King franchisees, therefore, ignore the No-Poach Clause at their peril and to their financial detriment.

### *Burger King Restaurants are Independent Businesses that Compete With Each Other*

30.    As established by Burger King's standard franchise agreement, each Burger King franchise is operated as an independently owned and

managed business, by an entity that is separate from Burger King. Specifically, the standard agreement states that Burger King franchisee is an "independent contractor and is not an agent, partner, joint venture, joint employer or employee of BKC, and no fiduciary relationship between the parties exists." Burger King licenses to franchisees the right to use the Burger King brand and system in the operation of these independently owned franchise restaurants.

31.     Defendants, through their direct ownership of certain Burger King restaurants, are competitors of the independently owned and operated franchises, which also compete among each other. Burger King informs franchisees that: (1) "[o]ther BURGER KING Restaurants may compete with your Restaurant"; (2) Burger King franchisees do not receive an exclusive territory; and (3) franchisees "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control." Restaurants owned by Burger King thus compete directly with Burger King franchisees, which in turn also compete with other franchisees to sell their products to customers.

32.     In executing the Burger King franchise agreement, a franchisee specifically acknowledges and represents that it is an independent business person or entity.

*The No-Poach Clause Benefits Burger King Restaurant Owners at the Expense of Employees and Consumers*

33.     Although each Burger King restaurant is an independently owned and operated business that competes with other Burger King restaurants—and although each franchisee contractually is "solely responsible for all aspects of the employment relationship with [their] employees, with the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, and employment policies," among other things—Burger King and its franchisees have agreed not to compete among each other for workers. This agreement is expressly stated in Burger King franchise agreements.

34.     Even though agreeing in September 2018 to begin removing the No-Poach Clause from future franchise agreements and stop enforcing it in old ones, Burger King enforced a no-poaching conspiracy among itself and franchisees for years in order to suppress wages.

35.     The Burger King franchise agreement contains an integration clause. Franchisees specifically contract that, with limited exceptions, franchises are governed by the terms of the franchise agreement a franchisee executes and not by terms later agreed to by other franchisees. Burger King informs prospective franchisees that the terms of the contract will govern the franchise.

36.     The Burger King Franchise Disclosure Document includes a list of all Burger King franchisees, organized by state, city, and street address. Franchisees thus know that these entities are the other franchisees as to whom

the No-Poach Clause memorialized in the franchise agreement applies.

37.    The No-Poach Clause would not be in the independent interest of Burger King restaurant owners if they were acting unilaterally. The profitability of each restaurant is critically dependent upon the quality of the workers they employ. It is therefore in the independent interest of Burger King and each Burger King franchisee to compete for the most conscientious, talented and experienced employees.

38.    The No-Poach Clause artificially restricts the ability of Burger King and its franchisees to hire employees in a manner consistent with their individual economic interests. But by acting in concert, they also protect themselves from having their own employees poached by other Burger King restaurants that may place value on those employees for their training, experience or work ethic. This allows Burger King restaurant owners to retain their best employees without having to pay market wages or provide them with attractive working conditions and opportunities for promotion.

39.    The No-Poach Clause does not benefit consumers because it does not help to ensure that Burger King restaurants produce a quality product or incentivize Burger King or its franchisees to invest in training workers to improve the food, experience, and service they provide at Burger King restaurants.

40.    Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.

Further, although unemployment is at record lows, wage growth remains sluggish. Fast-food workers regularly rely on public assistance to supplement their income. Higher wages would lessen the strain on public assistance, benefiting all consumers.

41.     Critically, the No-Poach Clause does not benefit Burger King restaurant employees because it does not spur Burger King and its franchisees to invest in higher wages, benefits, and improved working conditions to compete for their labor. Because employees are not rewarded appropriately for their efforts, they are not motivated to excel at their jobs. Competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

42.     Burger King and its franchisees have a shared anticompetitive motive to keep labor costs low. As noted above, franchisees pay Burger King royalties based on a percentage of gross sales. Cost of labor therefore has a direct impact on franchisees' profitability. By agreeing not compete for labor, they act against their unilateral self-interest, but serve and benefit from their shared interest.

43.     But for the No-Poach Clause, each Burger King franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages. But for the No-Poach Clause, each Burger King restaurant would compete with each other for the best-performing and qualified employees.

***Burger King Systematically Suppresses Employee Wages and Mobility Through the No-Poach Clause***

44.     Low wages are consistent across Burger King restaurants. This has allowed Burger King owners and executives, and Burger King franchisees, to enrich themselves financially while full-time, hardworking employees often must resort to government benefits just to survive. A material reason for this is that Burger King has orchestrated an agreement among franchisees to stifle employee wages and mobility.

45.     If Burger King restaurant owners had to either pay and promote good employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities. However, because of the No-Poach Clause—and because of their workers' level of education, training and experience within Burger King restaurants are unique and not transferrable to other restaurants—franchisees do not compete with each other or with Burger King, and they do not have to compete with non-Burger King businesses for their employees, excepting entry-level positions.

46.     Burger King and its franchisees are well-versed in no-poaching efforts as they regularly employ highly restrictive "unfair competition" agreements binding the franchise owners. Pursuant to the franchise agreement, both during and after the franchise term, Burger King franchisees are contractually prohibited from engaging indirectly or directly in any other competing business that engages in the sale of hamburgers.

-14-

47.    Burger King's form employment applications include a specific inquiry into whether the candidate has previously been employed at a Burger King restaurant. The application requests information about the dates, location, and supervisor relating to any such employment, as well as whether the store was corporate-owned or a franchise. The potential employer can use this information to quickly determine whether the No-Poach Clause is implicated for an applicant.

### Burger King Employees Cannot Easily Leverage Their Skills to Gain Employment Elsewhere

48.    Training, education, and experience at Burger King restaurants are not transferrable to other restaurants for a number of reasons.

49.    Burger King reserves for itself the right to specify or require certain brands or models of communications equipment, computer systems, hardware for back-office and point-of-sale systems, printers and peripherals, backup systems, and the like.

50.    Franchisees pay system-support fees for these proprietary systems and acknowledge that these systems provide access to confidential and proprietary information. Experience with these systems affords little value to other brand restaurants.

51.    Franchisees use approved or mandatory suppliers and vendors affiliated with Burger King. Experience with these vendors is of little value to other restaurants.

52.    Franchisees also utilize proprietary store operating procedures,

described in Burger King proprietary operating materials.

53.    Making matters worse, many fast food restaurant chains disfavor hiring employees and former employees of other fast food restaurant chains, meaning that Burger King workers are often blocked from working anywhere in the industry other than the particular restaurant where they are initially employed.

54.    A no-poach agreement like the agreement among Burger King and its franchisees reduces employees' outside options and render them less likely to quit, thereby increasing the share of net-returns captured by Burger King employers. Further, a no-poach agreement among all Burger King restaurant owners increases the specificity and one-off nature of human capital investment, as training that is productive throughout the chain can be used only by a single franchisee pursuant to the agreement.

### A Competitive Labor Market Would Include Solicitation and Hiring of Burger King Restaurant Employees by Other Burger King Restaurant Owners

55.    Corporate-owned Burger King restaurants compete with restaurants owned by its franchisees, and restaurants owned by franchisees also compete with among each other. In a free, properly functioning and lawfully competitive labor market, Burger King and its franchisees would openly compete for labor by soliciting current employees of one or more other Burger King restaurants (*i.e.*, attempting to "poach" other restaurants' employees).

56.    For all these reasons, the fundamental principle of free competition applies to the labor market as well as to trade. "In terms of

suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers."[10]

57.    According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees." Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."[11]

58.    The collusion of employers to refrain from hiring each other's employees restricts employee mobility. This raises employers' power in the market at the expense of employees and diminishes employees' bargaining power. This is especially harmful to employees of Burger King restaurants as those employees are frequently paid below a living wage, and the marketable skills they acquire through their work at such restaurants primarily have value only to other such restaurants and do not transfer to other fast food restaurants or businesses.[12] In addition, widespread use of no-poach agreements within the

---

[10] Joseph Harrington, Wharton professor of business economics and public policy, https://whr.tn/ScKBx2.
[11] *Id*.
[12] In 2014, the average hourly wage of fast food employees was $9.09 or less

fast food industry at large effectively reduces the number of competitive employers in a market to no more than the number of fast food companies. No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

59.     Although unemployment in the United States is currently very low, wage growth stagnates. A decade removed from the Great Recession, wage growth has remained stuck below 3 percent.[13] A growing number of commentators identify proliferating no-poaching agreements—including those used within franchise systems—and dubious employee non-compete agreements as significant contributors to the atrophy in wage growth.[14]

*Government Action in Response to Illegal No-Poach Agreements*

60.     The United States Department of Justice (DOJ) has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers. For instance, in 2010, DOJ settlements with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

61.     The 2016 DOJ/FTC *Antitrust Guidance for Human Resource*

---

than $19,000 per year for a full time worker. The poverty level of a family of four in the United States is $23,850. https://cnnmon.ie/2yJFc7s.
[13] *See* https://bit.ly/2FEpagY.
[14] *See*, *e.g.*, https://nyti.ms/2IkOon9; https://nyti.ms/2t04myZ.

Professionals states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."

62.     In July 2018, attorneys general (AGs) of 11 states announced an investigation into no-poaching hiring practices at a number of fast food franchise chains, including Burger King. According to a release from Illinois Attorney General ("AG") Lisa Madigan, the state is investigating no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages." The state AGs demanded documents and information from franchisors about their no-poach practices.

63.     On or about August 12, 2018, State of Washington Attorney General Bob Ferguson announced that in order to avoid lawsuits, certain franchisors had reached agreements to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from franchise agreements going forward. Burger King was among these franchisors.

64.     As part of its agreement with the Washington AG, Burger King entered into an Assurance of Discontinuation ("AOD") relating to the no-poach agreement evidenced in its current franchise agreement. In particular, Burger King agreed *inter alia* (i) to not include no-poach provisions in any future franchise agreements in the United States, (ii) to not enforce the provisions in any existing franchise agreements in the United States, (iii) to notify all U.S. franchisees of its agreement with the Washington AG, and (iv) to take steps to

remove the provisions from existing agreements with franchisees that have restaurants in Washington. The AOD specifically notes that Burger King "has no obligation to offer its franchisees any consideration – monetary or otherwise – in order to induce them to sign the proposed amendment [removing the provisions], or to take any adverse action against such franchisees if they refuse to do so[.]"

## REPRESENTATIVE PLAINTIFF ALLEGATIONS
## AND ANTITRUST INJURY

65.     Plaintiff Sandra Munster began working at the Burger King restaurant in Ottawa, Illinois on February 2, 2002. At all relevant times, Munster was an at-will employee.

66.     Munster was initially hired as a supervisor, with an hourly wage of $4.25. Over the years, her excellent work earned her promotions to various roles, including acting assistant manager (hourly wage of approximately $7.50) and assistant manager (hourly wage of approximately $9.50). In or around September 2015, Munster became the general manager of the Ottawa restaurant, with an annual salary of approximately $28,000. She earned subsequent pay increases that raised her annual salary to approximately $31,000.

67.     After leaving the Ottawa store on April 1, 2017, Munster applied for a job as general manager of the Burger King restaurant in Marseilles, Illinois, which had a vacancy at that position and which is only a few miles from where Munster lives in Ottawa; the position would have been an excellent

fit for her.

68.     Munster interviewed with the district manager, who told her that she would need a release from the Ottawa franchise before she could be allowed to be hired at the Marseilles store. The Ottawa franchise owner refused to grant her a release, so Munster was not able to take the new job.

69.     Because Burger King's No-Poach Clause prevented Munster from obtaining work at a competing Burger King restaurant, her only options were to wait six months (during which the General Manager position at the Marseilles franchise would almost certainly be filled) or to start over at an entry-level job with an entry-level wage in another setting.

70.     The no-poach agreement among Burger King and its franchisees suppressed Plaintiff's wages, inhibited her employment mobility, and lessened her professional work opportunities.

### *Antitrust Injury*

71.     Plaintiff suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the express agreement to restrain trade among Burger King and its franchisees, as orchestrated, facilitated and enforced by Burger King itself.

72.     Suppressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flows directly from illegal nature of the No-Poach Clause.

73.     The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place. Collusion is promoted when the no-poach agreements can be easily generated and monitored among a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

74.     The Burger King No-Poach Clause significantly restricts employment opportunities for low-wage workers at all Burger King restaurants, including those who have not sought employment with a competitor restaurant and those who have not been contacted by a competitor restaurant. Such a restriction causes a wider effect upon all Burger King restaurant employees.

75.     Plaintiff was a victim of the No-Poach Clause. By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

## CLASS ALLEGATIONS

76.     Plaintiff brings this action on behalf of herself, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3) described as follows: "All persons in the United States who are current or former employees of a Burger King restaurant operated by Burger King or a franchisee from at least 2010 forward (the 'Class')."

77.     Excluded from the Class are Defendants, their affiliates, officers

and directors, and the Court. Plaintiff reserves the right to modify, change, or expand the Class definition on discovery and further investigation.

78.     Numerosity: While the exact number of members of the Class is unknown to Plaintiff at this time, and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiffs are informed and believe that the Class includes thousands of members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through a class action will benefit the parties and the Court.

79.     Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class (Class Members). These questions predominate over questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

a.     Defendants engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

b.     Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§1, *et seq.*;

c.     Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

d.      Plaintiff and Class Members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

e.      The amount and nature of such relief to be awarded to Plaintiffs and the Class.

80.     Typicality: Plaintiff's claims are typical of the claims of the other members of the Class which she seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiff and each member of the Class have been subjected to the same unlawful, deceptive, and improper practices and has been damaged in the same manner thereby.

81.     Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff has no interests adverse to those of the Class Members. Further, Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

82.     Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

a. The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

b. If separate actions were brought by individual members of the Class,

the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

c. Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

83.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## **FRAUDULENT CONCEALMENT**

84.    Plaintiff and Class Members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff or the Class have put them on notice of the conspiracy. Any statute of limitations is therefore tolled by Defendants' intentional concealment of their No-Poach Clause. Plaintiff and Class members were deceived regarding Defendants' collusion to suppress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

85.    Neither Defendants nor franchisees disclosed the existence of the no-poach conspiracy to Plaintiff or Class Members.

86.    Public statements by Burger King conceal the fact that it orchestrated and engaged in a no-poach conspiracy with its franchisees.

87.    Plaintiff and the Class would thus have no reason to know of the

No-Poach Clause evidenced by franchisees' contractual undertakings with Defendants. Plaintiff and the Class are not parties to franchisees' contractual franchise agreements with Defendants. Nor are these contracts routinely provided to Plaintiff and Class Members.

88.     Although Defendants provided their form franchise documents to state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by prospective franchisees. Obtaining Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

89.     In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Burger King, a prospective franchisee must submit an application (with supporting documents) seeking to open a franchise. Only after Burger King reviews the application to ensure that the franchisee meets initial qualifications does Burger King provide the franchise disclosure document. Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $100,000 in liquid assets, a net worth of $250,000 or greater, and have the ability to obtain financing to cover the cost of opening a location.

90.     Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of franchisees, whether by Defendants, by franchisee employers, by regulators, or by anyone else. Historic franchise disclosure documents and form franchise

agreements would never be available to franchisee employees or prospective employees.

91.     Even upon entering into the Assurance of Discontinuation with the Attorney General of Washington relating to the current No-Poach Clause found in the Burger King franchise agreement, Burger King purported to deny that it was in violation of Washington state law or any other law, and further purported to deny that the no-poach agreement "had any adverse effect on competition in the industry or on the wages earned by its own or its franchisees' employees." Burger King also claimed that the No-Poach Clause was rarely enforced.

92.     Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiff and Class Members had no reason to know Defendants had conspired to suppress compensation or employee mobility.

93.     As a result of Defendants' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class Members have as a result of the anticompetitive and unlawful conduct alleged herein.

## **CLAIM FOR RELIEF**

**COUNT I: VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**

94.     Plaintiff, on behalf of herself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the

preceding and succeeding paragraphs of this Complaint, and further alleges against Defendants as follows:

95.     Beginning no later than 2103, Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.*

96.     Defendants engaged in predatory and anti-competitive behavior by orchestrating an agreement to restrict competition among Burger King restaurant owners, which unfairly suppressed employee wages, and unreasonably restrained trade.

97.     Defendants' conduct included concerted efforts, actions and undertakings between and among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among Burger King restaurant owners for skilled labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

98.     Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

99.     Defendants' conduct in furtherance of the no-poach agreement were authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

100.   Plaintiff and Class Members have received lower compensation from Burger King restaurants than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

101.   Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Antitrust Act.

102.   In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

103.   Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

104.   As a direct and proximate result of Defendants' contracts, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

105.   Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Antitrust Act and the threatened continuing violations alleged herein.

## PRAYER FOR RELIEF

106.    Wherefore, Plaintiff, on behalf of herself and Members of the Class, requests that this Court:

A. Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. Appoint Plaintiff as the representative of the Class and her counsel as Class Counsel;

C. Declare that Defendants' actions as set forth in this Complaint violate the law;

D. Award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

F. Permanently enjoin Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G. Permanently enjoining and restraining Defendants from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

H. Order Defendants to notify all Class Members that they have the unrestricted right to seek employment at any Burger King restaurant;

I. Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

J. Award pre-judgment and post-judgment interest on such monetary relief;

K. Award reasonable attorneys' fees and costs; and

L. Grant such further relief that this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Dated: November 2, 2018                   Respectfully submitted,

*/s/ John A. Yanchunis*
John A. Yanchunis
jyanchunis@forthepeople.com
Florida Bar No. 324681
Marcio W. Valladares
mvalladares@forthepeople.com
Florida Bar No. 0986917
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 North Franklin Street,
Seventh Floor
Tampa, Florida 33602
Telephone: (813) 223-5505

*/s/ Michael L. Schrag*
Michael L. Schrag
(*pro hac vice* to be submitted)
mls@classlawgroup.com
Eric H. Gibbs
(*pro hac vice* to be submitted)
ehg@classlawgroup.com
Joshua J. Bloomfield
(*pro hac vice* to be submitted)
jjb@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*/s/ George W. Sampson*
George W. Sampson
(*pro hac vice* to be submitted)
george@sampsondunlap.com
**SAMPSON DUNLAP LLP**
1001 4th Ave., Suite 3200
Seattle, WA 98154
Telephone: (206) 369-3962

*Attorneys for Plaintiff Sandra Munster
and the Proposed Class*